OFFICE OF THE UNITED STATES TRUSTEE

TIFFANY L. CARROLL
Acting United States Trustee
CURTIS CHING          3931
Assistant United States Trustee
NEIL VERBRUGGE 7478
Trial Attorney
300 Ala Moana Boulevard, Room 4108
Honolulu, Hawaii  96850
Telephone:  (808) 522-8155
ustpregion15.hi.ecf@usdoj.gov


# UNITED STATES BANKRUPTCY COURT

# DISTRICT COURT OF GUAM

| | |
|---|---|
| In re:<br><br>ASIA PACIFIC FINANCIAL<br>MANAGEMENT GROUP, INC.,<br><br>        Debtor and<br>        Debtor-in-Possession. | Case No. 23-00005<br>(Chapter 11) (Subchapter V)<br><br><u>Hearing:</u><br>Date:   March 31, 2022<br>Time:  8:30 a.m. (ChST)<br>Judge:  Hon. Frances Tydingco-Gatewood<br><br>[Related Docket Entries:  Dkts. #7, 8, 9, 10, 11, 12] |

### UNITED STATES TRUSTEE'S STATEMENT REGARDING <u>DEBTOR'S FIRST DAY MOTIONS</u>

The United States Trustee, by and through her attorney, hereby submits this statement regarding the Debtor's motions filed on April 26, 2023 (the "First Day Motions").  The United States Trustee has authority and standing to make this statement since its responsibilities include, among other things, supervising "the administration of cases … under Chapter 11" of the Bankruptcy Code.  28 U.S.C. § 586(a)(3).

1

## I. DKT. #7: DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING PAYMENT OF CERTAIN PRE-PETITION (I) WAGES, SALARIES, AND OTHER COMPENSATION; (II) REIMBURSEABLE EMPLOYEE BENEFITS; (III) EMPLOYEE BENEFITS; AND (IV) RELATED COSTS

### A. SECTION 507(a)(4): PREPETITION WAGES

The Debtor's Motion seeks authority pay or honor pre-petition wages. Debtor has separate categories of employees paid: (1) hourly wages, or (2) commissions. In general, the United States Trustee does not object to the payment of prepetition wages, and honoring accrued vacation and sick leave in the regular course of business, to the extent such payments do not exceed the Section 507(a)(4) priority cap of $15,150, *per employee*, and were earned within 180 days before the date of the filing of the petition. Debtor's Motion, however, lacks a schedule of wages and commissions to be paid *per employee* including the employee's name, date wages or commissions earned, and amount of wages and commissions.

#### 1. W-2 Employees: Hourly Wages

Debtor seeks authority to pay prepetition Wages and Commissions, and asserts that "*except as noted*" the amount of payments to each employee shall not exceed the statutory limit for priority claims of $15,150. Debtor cites 11 U.S.C. § 507(a)(4), which gives fourth priority status to unsecured wage, salary, commission, vacation, severance, and sick leave pay claims up to $15,150 *earned within 180 days before the date of the filing of the petition*. Debtor states its average gross payroll on a bi-weekly basis for its full time employees (7) and part time employees (1) and W-2 RRIA employees (2) is approximately $9,200 bi-weekly. However, the Debtor's motion does not attach a supporting schedule of wages or commissions owed (including employee name, date wages earned, amount of wages). The Court, and the United States Trustee, and interested parties, should be allowed to review a schedule of net pay to be received by employees, so that it can be readily determined whether such amounts are less than the

priority amount of $15,150. If the Motion is granted on an interim basis, the Debtor should be directed to file a schedule of net pay to be received by employees which includes the employees' names, date wages or commissions earned, amounts of wages or commissions to be paid.

        2.      <u>RRIA Employees: Commissions</u>

Debtor does not provide information on the average gross payroll for commissions, but only states the commission payroll varies. Although the Debtor states its payments to each employee shall not exceed $15,150, Debtor's Motion sets forth the following caveat: "*except as noted*". It is not clear if this caveat will result in the Debtor being authorized to make commission payments in excess of $15,150. Debtor should not be allowed to pay, post-petition, commission payments on account of prepetition commission owed that exceed the priority amount per employee of $15,150. Debtor's motion does not attach a supporting schedule of commissions owed (including employee name, date commissions earned, amount of commissions). It is not clear if "insiders" will receive amounts in excess of the priority amount of $15,150. The Court, and the United States Trustee, and interested parties, should be allowed to review a schedule of net pay to be received by employees if the Motion is granted, so that it can be readily determined whether such amounts are less than the priority amount of $15,150. If the Motion is granted on an interim basis, the Debtor should be directed to file a schedule of net pay to be received by employees which includes the employees' names, date wages or commissions earned, amounts of wages or commissions to be paid.

## B.    <u>DEBTOR'S WITHOLDING OBLIGATIONS</u>

The United States Trustee does not oppose this relief requested in the Motion.

C.     BUSINESS EXPENSE REIMBURSMENTS

Debtor's Motion also seeks authority pay "Reimbursable Obligations". Debtor states that it believes no reimbursement obligations are outstanding. However, Debtor still includes a request for authorization to pay reimbursement obligations. Because the term Reimbursable Obligation is not narrowly defined or subject to a monetary cap, Debtor's request appears to be potentially open-ended, and unlimited in amount. Debtor should not be allowed to have unfettered discretion to pay reimbursable obligations, that it has incurred pre-petition to employees, that are potentially unlimited in scope and amount. As an extreme example, with the broad authorization requested, Debtor could potentially improperly pay prepetition capital contributions made by "insiders" seeking reimbursement. If there are "reimbursable employee expenses" that Debtor desires to reimburse to employees, then Debtor should provide a schedule of employee business-related reimbursement requests that are outstanding, and authorization should be limited to actual, reasonable expenses with a modest cap (i.e., less than $500) on the amount of employee reimbursement. Otherwise, this request is unnecessary, and should not be granted, especially in the context of a "first day" motion.

D.     PAID TIME OFF

Debtor seeks authority to honor "paid time off" ("PTO"). The United States Trustee does not object to Debtor's honoring accrued vacation and sick leave in the regular course of business. However, the United States Trustee objects to any "cash-out" PTO payments, which combined with other pre-petition employee wage or commission payments, that exceed the Section 507(a)(4) priority cap of $15,150, per employee. The Court, and the United States Trustee, and interested parties, should be allowed to review a schedule of PTO earned within 180 days before the date of the filing of the petition so that it can be readily determined whether such PTO

4

amounts (combined with wages or commissions owed) are less than the priority amount of $15,150.

E.     SECTION 507(a)(5):  EMPLOYEE FRINGE BENEFITS

The United States Trustee does not oppose Debtor's motion to pay medical vision, dental insurance, and worker's compensation insurance.

Debtor's Motion seeks authorization to make payments for employee's 401(k) plan and Profit Sharing Plan.  It is not clear what amount of contributions the Debtor is seeking to pay for any employee's 401(k) contributions or Profit Sharing Plan arising from services rendered within 180 days before the date of the filing of the petition.  No schedule was attached to the Motion from which it could be determined that such employee payments would be less than the Section 507(a)(5) priority cap amount of $15,150.  To the extent the Debtor is seeking unfettered discretion to recognize and pay, at its sole discretion, "contributions to any pension, profit-sharing or retirement plans" in excess of the priority cap of $15,150, the United States Trustee opposes this request.

## II.     DKT. #8:  MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER APPROVING THE ASSUMPTION OF THE REGISTERED REPRESENTATIVE & INVESTMENT ADVISOR REPRESENTATIVE AGREEMENTS

Debtor's Motion seeks to assume certain contracts with employees who provide investment advisory services.  Debtor Motion is made pursuant to Section 365 and Rule 6006. As an initial matter, Debtor's Motion should not be granted on a final basis.  Pursuant to Rule 6003(c), except to avoid immediate and irreparable harm, the Court shall not, within 21 days after the filing of the petition, issue an order granting a motion to assume an executory contract under Section 365.  Thus, Debtor's motion may only be granted on an interim basis.  However, it is not clear that the Motion should be granted on an interim basis because there is no apparent

immediate irreparable harm in waiting for a final hearing on the Motion.  In fact, Debtor's Motion states that "no amounts are presently due under the RRIA Agreements".  Debtor "anticipates that as of May 20, 2023, the RRIAs will be entitled to commissions for the time period of April 2023, May 2023 and June 2023."  Thus, there appears to be no pressing need for the Debtor to assume the RRIA Agreements prior to a final hearing on the Motion to assume.  Debtor's Motion states that payments of commissions will include commissions based on "pre-petition sales and services".  Before a final hearing, it would be helpful to know the amount of commissions owed based on the "pre-petition sales and services".

**III.  DKT. #9:  DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING EMPLOYMENT AND PAYMENT OF PROFESSIONALS UTILIZED IN THE ORDINARY COURSE OF BUSINESS AND (II) GRANTING RELATED RELIEF**

Debtor's Motion seeks authority to pay "ordinary course professionals" during the pendency of the case subject to a monthly fee cap of "$25,000 per month on average over any rolling three-month period" without formally retaining such professional or filing a fee application for such professional.  This motion should not be granted on a final basis.  *See* Rule 6003(a) (stating that an application under Rule 2014 should not be granted within 21 days after the filing of the petition except to the extent relief is necessary to avoid immediate and irreparable harm).

Debtor acknowledges that Section 327 requires Debtor to file applications to employ professionals in connection with the "administration of this chapter 11 case or in connection with special matters not appropriate for ordinary course treatment", and that "Chapter 11 Professionals" are only permitted to be compensated and reimbursed in accordance with the Bankruptcy Code, i.e., fee applications approved by the Court.  Debtor claims the professionals

on its "OCP" list above are professionals providing services "unrelated to the administration of the chapter 11 cases". Debtor's "OCP" list includes:

**SCHEDULE 1**

**(Ordinary Course Professionals)**

| Ordinary Course Professional | Mailing Address | Description of Services |
|---|---|---|
| Michael Best | 170 South Main Street Suite 1000 Salt Lake City, UT 84101 | Regulatory/Arbitration |
| Burger Comer Magliari CPA | 333 S. Marine Corps Drive #102 Tamuning, Guam, 96913 | Accounting |
| Saro Partners | 333 Tamiami Trail Suite 291 Venice, FL 34284 | Compliance |

It is not clear that the above professionals are "ordinary course professionals" *unrelated* to the administration of the Debtor's bankruptcy case. Debtor's bankruptcy case appears to have been precipitated by an arbitration award in the amount of $4.1 million in favor of Michael Phillips against Debtor. It appears the Mr. Michael Best is an attorney, who is also a creditor with a prepetition claim of $100,000,[1] whose potential services may be central to the Debtor's reorganization efforts. If so, Mr. Best would need to file an application for employment as counsel or special counsel,[2] and file fee applications subject to court approval prior to payment.

---

[1] *See* Debtor's List of Largest 20 Unsecured Creditors:

| Michael Best & Friedrich, LLP 1700 South Main Street, Ste 1000 Salt Lake City, UT 84101 | Anne Freeland atfreeland@michaelbest.com 385-695-6456 | Legal Services | | | | | $100,000.00 |
|---|---|---|---|---|---|---|---|

[2] *Compare* Section 1195 which provides that, notwithstanding Section 327(a), a person is not disqualified for employment by a debtor under Section 327 solely because that person holds a claim of less than $10,000 that arose pre-petition.

7

Due to the lack of information, it is not clear whether Burger Comer Magliari CPAs and Saro Partners should be considered "ordinary course professionals". Finally, the Motion's "monthly fee cap" of $25,000 per month seems large for a case of this size, and without any idea of the Debtor's budget. Is the $25,000 monthly fee cap per professional or an aggregate OCP fee cap? The Debtor should provide a 3-6 month budget to demonstrate that it is administratively solvent to afford the monthly fee cap amounts.

## IV. DKT. #10: DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTOR'S PROPOSED ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES; (II) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING OR DISCONTINUING SERVICES; (III) APPROVING THE DEBTOR'S PROPOSED PROCEDURES FOR RESOLVING ADEQUATE ASSURANCE REQUESTS, AND (IV) GRANTING RELATED <u>RELIEF</u>

The United States Trustee has no objection to this motion being granted on an *interim* basis. Before a final order is entered, a final hearing should be scheduled to provide the utilities with sufficient notice and opportunity to be heard on the relief and procedures sought in the motion.

## V. DKT. #11: DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE USING ITS CASH MANAGEMENT SYSTEM, AND (B) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS AND BOOKS AND RECORDS, AND (III) <u>GRANTING RELATED RELIEF</u>

### A. <u>DEBTOR SHOULD NOT BE EXCUSED FROM OPENING DEBTOR-IN-POSSESSION ACCOUNTS</u>

The United States Trustee objects to the Debtor retaining its pre-petition Bank of Hawaii Account ending in #1076 as its debtor-in-possession account. Although the Bank of Hawaii is a depository approved to accept bankruptcy estate funds in Guam, the Debtor should close its pre-petition account with the Bank of Hawaii, and open new Debtor-in-Possession accounts with the Bank of Hawaii (or other approved depository), properly labeled, for purposes of post-petition

deposits.  Debtor's business does not have any unique or unusual features that would warrant deviating from the general guidelines which require the establishment of new, separate debtor-in-possession accounts.

The United States Trustee's Operating and Reporting Requirements for Chapter 11 cases requires all pre-petition bank accounts and other deposits of which a debtor has possession, custody, control, ownership, use or access must be closed upon the filing of a petition, and new debtor-in-possession accounts be opened.  The purpose of closing pre-petition accounts, and opening new debtor-in-possession accounts is to safeguard the estate's money for the benefit of all creditors.  Accounts with balances containing more than $250,000 are not protected if those monies are deposited into a non-DIP account.  Establishing debtor-in-possession accounts ensure security (collateralization in excess of FDIC limits), transparency (periodic reporting of bank balances to the United States Trustee for monitoring), and notice to parties dealing post-petition with the Debtor.  That is why the United States Trustee guidelines and Section 345(a) require that operating accounts and/or other accounts be deposited into an FDIC insured depository institution on the list of participating banks approved by the United States Trustee.  11 U.S.C. § 345(a), 31 C.F.R. § 225.  Guam's local bankruptcy rules support this requirement.  Bankruptcy Local Rule 2015-7, relating to Debtor's Books and Records, requires:

**(a) Voluntary Cases.**  In a case filed pursuant to § 301 or 302, the books and records of the debtor shall be closed on the day immediately preceding the day on which the petition is filed, whether or not a separate estate is created for tax purposes. Prepetition liabilities must be segregated and reported separately from post-petition liabilities.

9

**Funds of the Estate – Account Identification**. The signature card (or if there is none, the depository agreement) for any account containing funds which are the property of a bankruptcy estate must clearly indicate that the depositor or investor is a "debtor in possession" or a trustee in bankruptcy.

The Debtor's primary reason to request excusal from the general requirement to close its prepetition accounts, and open new debtor-in-possession accounts appears to be a matter of convenience and to avoid alleged "disruption". Because the establishment of debtor-in-possession accounts provides clear benefits by ensuring security, transparency, and notice, such benefits clearly outweigh any alleged *de minimis* administrative burden of opening new debtor-in-possession accounts at the Bank of Hawaii. As such, there is no good reason to relieve the Debtor of the obligation to open new debtor-in-possession accounts. The Debtor should not be allowed to circumvent the requirement to establish new debtor-in-possession accounts which would deprive the United States Trustee of safeguards with participating banks. Section 105, however, should not override a practice (debtor-in-possession accounts) that allows compliance with the requirements of Section 345(b). Only in the most extreme cases should debtors be allowed to depart from the usual procedures which include the opening of new debtor-in-possession accounts. There are no unique or unusual circumstances in this case.[3]

Finally, any administrative burden or alleged "disruption" is *de minimis* given the United States Trustee is agreeable to a short transition period, i.e., 2-3 weeks, to allow Debtor's staff to take action to ensure: (1) authorized payments (i.e., court approved wages) may be completed (provided, however, Debtor takes adequate precautions to ensure that any pending prepetition

---

[3] For example, there is no evidence the Debtor would need to establish a large volume (hundreds or thousands) of new debtor-in-possession accounts in order to successfully conduct its business.

payments are not honored), and (2) any post-petition deposits are re-routed from the old pre-petition bank account into the new debtor-in-possession account.  Given the United States Trustee's willingness to allow a reasonable transition period of approximately 2-3 weeks, Debtor's staff will have ample time to ensure any automatic payments to third parties are re-routed from the old pre-petition account to the new debtor-in-possession account.

B.    <u>DEBTOR SHOULD BE REQUIRED TO CLOSE CREDIT CARDS</u>

Debtor seeks authority to continue using its prepetition credit cards.  Debtor should be required to close its prepetition credit cards to avoid confusion as to whether payments on the credit cards are improper payments of prepetition debts.

C.    <u>DEBTOR SHOULD BE REQUIRED TO CLOSE "RESERVE ACCOUNT" AND TRANSFER FUNDS TO DEBTOR-IN-POSSESSION ACCOUNT</u>

Debtor states it has $356,329.00 in funds in an account at RBC Capital Markets, LLC, a subsidiary of the Royal Bank of Canada (the "Reserve Account").  Debtor's Motion requests a waiver of Section 345(b)[4] and alleges that RBC is well capitalized with an excellent credit rating. However, RBC is not a depository approved to accept bankruptcy estate funds in Guam and the Commonwealth of the Northern Mariana Islands.  Accordingly, the United States Trustee opposes Debtor's request to maintain the Reserve Account.  Debtor's stated reason to request a waiver of Section 345(b) appears to be to avoid "costs and delays associated with transiting its reserve funds to a debtor-in-possession account".  There is no showing that there would be any difficulty in completing a transfer of the funds, and Debtors has not set forth adequate justification waive Section 345(b).  The Debtor should promptly transfer the funds held in the Reserve Account to a debtor-in-possession account held at an approved depository.

---

[4] Section 345(b) requires that money of the estate be deposited with an entity that has executed a bond in favor of the United States unless the Court otherwise orders.  Approved depositories ensure collateralization in excess of FDIC limits.

## VI.   SUBCHAPTER V TRUSTEE:  SET-ASIDE FOR FEES

A Debtor that elects to proceed under Subchapter V of Chapter 11 should account for reasonably foreseeable post-petition administrative expenses.  The Subchapter V Trustee's anticipated fees and expenses qualify as post-petition administrative expenses.  Under 11 U.S.C. § 1183, as promulgated by Congress, the Subchapter V Trustee is charged with, among other responsibilities:

> 1183(b) Duties.  The trustee shall—
>
> (1) perform the duties specified in paragraphs (2), (5), (6), (7), and (9) of section 704(a) of this title;
>
> (2) perform the duties specified in paragraphs (3), (4), and (7) of section 1106(a) of this title, if the court, for cause and on request of a party in interest, the trustee, or the United States trustee, so orders;
>
> (3) appear and be heard at the status conference under section 1188 of this title and any hearing that concerns—
> (A) the value of property subject to a lien;
> (B) confirmation of a plan filed under this subchapter;
> (C) modification of the plan after confirmation; or
> (D) the sale of property of the estate;

Even where an estate remains as a debtor-in-possession, Congress intended for the Subchapter V Trustee to monitor the Debtor's case including being heard on issues relating to the value of property subject to a lien, confirmation of a plan, and the sale of any property.

Compensation of a Subchapter V Trustee appointed on a *case-by-case* basis is subject to 11 U.S.C. § 330.  The United States Trustee requests the Debtor "set-aside" the amount of $2,000 per month, from the petition date to the month of confirmation, to be delivered to the Subchapter V Trustee to hold in trust pending approval of her fee application, to assure there are funds available to pay the Subchapter V Trustee for her statutory services in this case.  This "set-

aside" amount should not be considered a maximum or a minimum on any Subchapter V Trustee's fees and expenses which would be subject to Court approval.[5]

To avoid uncertainty in Debtor's payment of the Subchapter V Trustee's anticipated reasonably necessary post-petition administrative expenses, and to ensure funds are available to pay the Subchapter V Trustee for his statutory services in this case, the United States Trustee requests the following be ordered in connection with any order on Debtor's Motion for Cash Management:

- Debtor include in its budget a line item of $2,000/mth for projected Subchapter V Trustee fees and expenses, from the petition date to and including the month of confirmation.

- The Debtor be ordered to pay up to $200 for the Trustee's bond premium, which amounts shall not be counted against the budget limits.

- Debtor be ordered to transfer two thousand dollar ($2,000.00) every month, beginning on the first day of the month immediately after the petition was filed on April 26, 2023 (i.e., beginning on May 1, 2023), and continuing monthly thereafter until the date an order of confirmation is entered, or the case is dismissed or converted, to the Subchapter V Trustee to hold in trust pending approval of her fee application, which funds shall be referred to hereinafter as the "Set-Aside Funds". The Set-Aside Funds that are held by the Subchapter V Trustee in trust, pending approval of her fee application, shall not be commingled with any other monies. The Subchapter V Trustee shall hold the Set-Aside Funds, in trust, until such time as the Court awards or denies compensation to the Subchapter V Trustee. The amount of the Set-Aside Funds shall not be considered a maximum or minimum on any fees and expenses that may be awarded by the Court to the Subchapter V Trustee.

---

[5] Similar relief, to set-aside funds to ensure payment of the Subchapter V Trustee's fees and expenses, was ordered in *In re Titan Imports, Inc, Bk. No. 22-00007, In the District Court of Guam, Bankruptcy Division*, Dkt. 36, and *In re Beach Resorts, LLC, Bk. No. 21-00034, In the District Court of Guam, Bankruptcy Division*, Dkt. 31.

## VII. DKT. #12: DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING PROCEDURES TO MAINTAIN CONFIDENTIALITY OF THE DEBTOR'S CLIENT LIST AND GRANTING RELATED RELIEF

### A. THE MOTION TO MAINTAIN CONFIDENTIALITY OF CLIENT LIST SHOULD BE HEARD ON PROPER NOTICE

The Debtor's Motion Authorizing Procedures To Maintain Confidentiality Of The Debtor's Client List ("Motion") should be heard on ordinary notice or with some reasonable opportunity for parties to respond. The United States Trustee, and other parties, have only had minimal opportunity to respond (approximately 24 hours to review, research, and respond) to the Motion. This is insufficient given the complexity of the motion and proposed relief. No final relief should be granted. The United States Trustee does not oppose maintaining the status quo on disclosure until the Court's final hearing on this Motion.

### B. DEBTOR SHOULD DISCLOSE PARTIES WITH EXECUTORY CONTRACTS

Disclosure is a basic premise of bankruptcy law and is fundamental to the operation of the bankruptcy system. The Bankruptcy Code contains very limited and specific exceptions to the general rule that bankruptcy proceedings should be open and transparent. In this case, the Debtor acknowledges that the Code (FRBP Rule 1007(b)) requires disclosure of parties with whom the Debtor holds executory contracts but seeks permission to hold secret all of these executory contracts. Federal Rule of Bankruptcy Procedure 1007 states that a debtor "*shall* file the following schedules, statements, and other documents, prepared as prescribed by the appropriate Official Forms, if any: (A) schedules of assets and liabilities; (B) a schedule of current income and expenditures; (C) a schedule of executory contracts and unexpired leases; (D) a statement of financial affairs; . . ." FRBP Rule 1007(b)(1) (emphasis added). Likewise, Guam Bankruptcy Local Rule 1007-2 authorizes the clerk of court to reject a petition that is filed

"without a mailing matrix, i.e., the list of name and addresses of entities to be included in Schedules D, E, F, G, and H." Guam LBR 1007-2(a). See also Guam LBR 1007-2(d). The information the Debtor seeks to conceal here falls directly into the category of information that is required to be disclosed when a party avails itself of the protections of the Bankruptcy Code. *See* 11 U.S.C. § 521.

Under the Bankruptcy Code, any party seeking to depart from disclosure requirements must meet the requirements of Section 107, and demonstrate extraordinary circumstances and compelling need. Here, Debtor has not satisfied the requirements of Section 107, and has not demonstrated compelling need under the Code's limited exception to the general rule of transparency and disclosure.

a. <u>Section 107(b) Of the Bankruptcy Code Is Narrowly Construed and a Denial Of Open Access To Court Records Must Be Supported By Evidence</u>

There is a strong presumption and public policy in favor of public access to court records. *In re Motors Liquidation Co.*, 561 B.R. 36, 41 (Bankr. S.D.N.Y. 2016); *In re Borders Grp., Inc.*, 462 B.R. 42, 46 (Bankr. S.D.N.Y. 2011); *In re Food Mgmt. Grp., LLC*, 359 B.R. 543, 553-55 (Bankr. S.D.N.Y. 2007) ("The public interest in openness of court proceedings is at its zenith when issues concerning the integrity and transparency of bankruptcy court proceedings are involved"); *see also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 597-98 (1978). "This policy of open inspection, established in the Bankruptcy Code itself, is fundamental to the operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised." *Motors Liquidation*, 561 B.R. at 41-42 (citing *In re Bell & Beckwith,* 44 B.R. 661, 664 (Bankr. N.D. Ohio 1984)).

The policy setting the Bankruptcy Code's emphasis on transparency is set out in Section 107(a) which states,

15

Except as provided in subsections (b) and (c) and subject to section 112, a paper filed in a case under this title and the dockets of a bankruptcy court are *public records and open to examination* by an entity at reasonable times without charge.

11 U.S.C. § 107(a) (emphasis added).

The only exceptions are found in subsections (b) and (c). In the Motion, the Debtor cites Section 107(b)(1) as its sole statutory basis to allow sealing the identities of those parties. Section 107(b)(1) states,

On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may –

(1) protect an entity with respect to a trade secret or confidential research, development, or commercial information;

11 U.S.C. § 107(b)(1). See also FRBP Rule 9018. Accordingly, the exception to public disclosure applicable to this case is limited to protecting "an entity with respect to a trade secret or confidential research, development or commercial information." 11 U.S.C. § 107(b)(1).

b. <u>Section 107(b) Is Narrowly Construed And Sealing Information Required In The Bankruptcy Schedules Must Be Supported By Evidence.</u>

The "exception to the general right of access in section 107(b) is narrow" and should only be entered when actually necessary to protect a party from harm. *In re Borders Grp., Inc.*, 462 B.R. 42, 47 (Bankr. S.D.N.Y. 2011); *see also In re Anthracite Cap., Inc.*, 492 B.R. 162, 171 (Bankr. S.D.N.Y. 2013) (finding that "a court's ability to limit the public's right to access remains *an extraordinary measure* that is warranted *only under rare circumstances* as public monitoring is an essential feature of democratic control.") (emphasis added).

Where a party seeks to have court records sealed because of the purported economic consequences of disclosure, courts have demanded more than mere argument and speculation. *See, e.g., Republic of the Philippines*, 949 F.2d 653, 663 (3rd Cir. 1991) (a party must offer "evidence ... to substantiate its claim that the disclosure of ... records ... would result

in any type of competitive disadvantage"); *Joy v. North*, 692 F.2d 880, 894 (2nd Cir. 1982) (report filed in court in connection with a shareholder derivative action could not be sealed based on "a naked conclusory statement that publication of the Report will injure the bank in the industry."); *In re Barney's, Inc.*, 201 B.R. at 708 ("speculat[ion] that the public disclosure of ... letter will adversely impact debtors reorganization efforts" insufficient to justify sealing record); *In re Fibermark, Inc.*, 330 B.R. 480, 506 (Bankr. D. Vt. 2005) ("that information might 'conceivably' or 'possibly' fall within a protected category is not sufficient to seal documents"); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071-73 (3rd Cir. 1059) (court must make "specific findings" as sealing cannot be based on speculation).

c.      <u>Debtor has not met its burden to keep its Customer names secret because the Identity of Debtor's Customers Is Not Confidential or Commercial Information.</u>

"Commercial information," as used in Section 107(b)(1), is defined as "information which would cause 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.' " *In re Celsius Network LLC*, 644 B.R. 276, 288-89 (Bankr. S.D. N.Y. 2022) *citing In re Orion Pictures Corp.*, 21 F.3d at 27 (quoting *Ad Hoc Protective Comm. for 10 1/2 % Debenture Holders v. Itel Corp. (In re Itel Corp.)*, 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)). "Commercial information" must be "so critical to the operations of the entity seeking the protective order that its disclosure will unfairly benefit the entity's competitors." *In re Barney's, Inc.*, 201 B.R. 703, 708–09 (Bankr. S.D.N.Y. 1996) (citing *In re Orion Pictures Corp.*, 21 F.3d at 28). The burden is on the moving party to show that a request to place documents under seal falls within the parameters of Section 107(b). *In re Borders Grp., Inc., 462 B.R. at 46; In re Food Mgmt. Grp., LLC,* 359 B.R. at 561. To meet this burden, the movant "must demonstrate extraordinary circumstances and compelling need to obtain

17

protection." *Food Mgmt.*, 359 B.R. at 561 (*citing In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2nd Cir. 1994)).

The Debtor has not demonstrated that its customer's names constitutes "commercial information" warranting an exception to the public policy of full disclosure to the public. First, The Debtor states that disclosure "would *likely* be contrary to the legitimate privacy expections of Clients." Motion, paragraph 8 (emphasis added). Through this, the Debtor *speculates* that its clients have privacy expectations. It is unclear what promises, if any, the Debtor has made to its customers about privacy. The Debtor's website,[6] unlike many companies, appears to lack a privacy policy. There is no stated company policy disclosed to the public which indicates that customer names will be kept confidential.

Second, the Debtor provides no substantive evidence about the harm it would suffer. The Debtor speculates that competitors could use the names of clients to solicit business and contends that clients would suffer "harm" by the mere disclosure that they have a business relationship with the Debtor. These bare contentions do not constitute evidence of harm. It certainly is not sufficient to overcome the presumption of public access to required information on bankruptcy schedules.

In *In re Celsius Network LLC,* 644 B.R. 276 (Bankr. S.D. N.Y. 2022), the Court held that in light of the strong public policy of transparency and very narrow exceptions only on strong evidentiary showings, the names of customers were not "commercial information" under Section 107(b)(1). The Court required disclosure of customers' names but allowed keeping the individuals' (but not corporations') addresses private. 644 B.R. at 292-93. The *Celsius Network* holding stands in contrast to the Debtor's pronouncement that client lists "are a prototypical class

---

[6] https://www.apfmg.com/

18

Case 23-00005   Document 21   Filed 04/27/23   Page 18 of 20

of 'commercial information' that requires protection" "as a matter of bankruptcy law." Motion, paragraph 17.

Third, the Debtor claims that complying with disclosure requirements would be "burdensome, time-consuming, and expensive, and will deplete estate resources unnecessarily." Motion, paragraph 8. This appears incorrect since the Debtor later says it will provide separate (but private) notices to its customers. The U.S. Trustee would not oppose provided formal notices transmitted by email. Moreover, avoiding "burdensome" requirements is not a consideration under Section 107(b)(1).

Fourth, the Debtor cites SEC Regulation S-P, 17 CFR§ 248.1 for the proposition that the Debtor could face civil penalties for disclosure of client information and points to a case where a firm was fined $200,000. But as the Motion admits, 17 CFR § 248.15 contains a very clear provision authorizing disclosure "[t]o comply with federal … laws, rules, and other applicable legal requirements[.]" 17 CFR § 248.15(7).  This language expressly authorizes disclosure of client information as required by federal bankruptcy law.  Thus, this regulation provides no justification to seal client information. Moreover, the cited case in which a firm was fined $200,000 involved a completely different situation[7] where the firm's emails were compromised, the firm delayed notification of customers and took three years to implement enhanced security measures which placed client information at unneeded risk. That case has little relevance to this bankruptcy case where an existing law (Rule 1007) requires the disclosure of executory contracts.

Even in cases where protections are allowed, the Court has discretion when deciding how to protect commercial information.  *In re Celsius Network LLC*, 644 B.R. at 289. The policy

---

[7]  https://www.sec.gov/news/press-release/2021-169

favoring public access supports making public as much information as possible while preserving confidentiality of protectable information. *Id.* If the Court is inclined to grant some protections, any order should be tailored to only seal customer information that is absolutely necessary to preserve commercial information.

DATE: Honolulu, Hawaii, April 26, 2023.

Tiffany L. Carroll
Acting United States Trustee

By /s/ Neil Verbrugge
Trial Attorney