OFFICE OF THE UNITED STATES TRUSTEE

TIFFANY L. CARROLL
Acting United States Trustee
CURTIS CHING          3931
Assistant United States Trustee
NEIL VERBRUGGE 7478
Trial Attorney
300 Ala Moana Boulevard, Room 4108
Honolulu, Hawaii  96850
Telephone:  (808) 522-8155
ustpregion15.hi.ecf@usdoj.gov

# UNITED STATES BANKRUPTCY COURT

# DISTRICT COURT OF GUAM

| | |
|---|---|
| In re:<br><br>ASIA PACIFIC FINANCIAL MANAGEMENT GROUP, INC.,<br><br>   Debtor and<br>   Debtor-in-Possession. | Case No. 23-00005<br>(Chapter 11) (Subchapter V)<br><br>"First Day"/Interim Hearing:<br>Date: April 28, 2023<br>Time: 8:30 a.m. (ChST)<br>Judge:  Hon. Frances Tydingco-Gatewood<br><br>Final Hearing<br>Date: May 26, 2023<br>Time: 8:30 a.m. (ChST)<br>Judge:  Hon. Frances Tydingco-Gatewood<br><br>[Related Docket Entries:  Dkts. #8, 9, 11, 12] |

## UNITED STATES TRUSTEE'S SUPPLEMENTAL OMNIBUS STATEMENT REGARDING DEBTOR'S FIRST DAY MOTIONS

The United States Trustee, by and through her attorney, hereby submits this Omnibus

Supplemental Statement ("Supplemental Statement") regarding certain of the Debtor Asia

Pacific Financial Management Group, Inc. ("Asia Pacific" or "Debtor") "First Day" motions

filed on April 26, 2023 (the "First Day Motions").  The United States Trustee's Supplemental

Statement addresses only the remaining First Day Motions for which the United States Trustee has continuing concerns:  Dkts. #8, 9, 11, and 12.  The United States Trustee has authority and standing to make this statement since its responsibilities include, among other things, supervising "the administration of cases … under Chapter 11" of the Bankruptcy Code.  28 U.S.C. § 586(a)(3).

**I.      DKT. #8:  MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER APPROVING THE ASSUMPTION OF THE REGISTERED REPRESENTATIVE & INVESTMENT ADVISOR REPRESENTATIVE AGREEMENTS**

Debtor's Motion for Entry of an Order Approving the Assumption of the Registered Representative and Investment Advisor Representative Agreements ("Motion to Assume") seeks to assume Representative and Investment Advisor Representative Agreements (the "RRIA Contracts") with Representatives who provide investment advisory services.  Under the Interim Order, except allowing Debtor to make commission payments to its Representatives not to exceed $15,150, the balance of the relief requested in the motion was set for final hearing.

**A.      BECAUSE THE DECISION ON ASSUMPTION SHOULD BE CONTINUED,[1] DEBTOR SHOULD NOT PAY TO REPRESENTATIVES ANY COMMISSIONS OWED FOR PREPETITION SERVICES IN EXCESS OF 507(a)(4) CAP**

In general, where a broker materially performs under a commission agreement prior to the petition filing date, the broker's claims are prepetition general unsecured claims.  *See In re Snowcrest Dev. Grp., Inc.*, 200 B.R. 473, 480–81 (Bankr. D. Mass. 1996).  Paragraph 4 of the RRIA contracts state "APFMG calculates the Representative compensation on an accrual basis; payout will commensurate between the 20th-30th of each month."  Debtor's Motion to Assume stated that "no amounts are presently due under the RRIA Agreements", and Debtor "anticipates

---

[1] *See In re Network Access Sols., Corp.*, 330 B.R. 67, 76 (Bankr. D. Del. 2005) (stating that "when a contract is assumed under section 365, all unpaid amounts due under the agreement must be paid.").

2

that as of May 20, 2023, the RRIAs will be entitled to commissions for the time period of April 2023,[2] May 2023 and June 2023."  In the United States Trustee's initial Statement, the United States Trustee pointed out that it would be helpful if the Debtor provided information to determine whether any of the RRIA commissions Debtor seeks to pay are owed as a result of "pre-petition sales and services".  *See In re Corcoran*, 2010 WL 5207589, at *1 (Bankr. D. Haw. Dec. 16, 2010) (ruling independent contractors had priority claim against debtor for unpaid percentage fee arising from providing prepetition court reporting services).  After the initial interim hearing, the Court entered an interim order allowing Debtor to pay RRIA "capped" commission to its Representatives not to exceed $15,150:[3]

> 4.      The Debtor is authorized to pay the RRIAs according to the ordinary course payment terms of the RRIA Agreements, including payments due on or after May 20, 2023, provided that such payments under the RRIA Agreements shall not exceed $15,150.00 until after the Final Hearing on the Motion or further Order of the court.

Since then, the United States Trustee requested Debtor provide information sufficient to determine the amounts owed by Debtor to its Representatives on account of prepetition production/revenue.  However, the United States Trustee has not received sufficient information to determine the exact amounts allocable to prepetition production/revenue.  To the extent Debtor's Motion to Assume seeks to pay amounts owed by Debtor to its Representatives on account of prepetition production/revenue, the Court should require Debtor provide additional

---

[2]  Debtor's petition was filed on April 26, 2023.

[3]  Section 507(a)(4)(A) allowed a "priority" unsecured claim for "commissions" up to $15,150 earned within 180 days before the filing of the petition.

information disclosing the unpaid amount earned prepetition within 180 days of the filing of the petition. Absent such information, the Court should deny any request to pay in excess of $15,150 per Representative. *See In re HSD Venture*, 178 B.R. 831, 836–37 (Bankr. S.D. Cal. 1995) (denying debtor's motion to pay realtors' commissions as administrative expense because realtors' earned their commissions pre-petition, and claims were only general unsecured claims not entitled to be elevated to post-petition administrative expense); *In re Main Line Corp.*, 2006 WL 385679, at *5 (Bankr. S.D. Fla. 2006) (ruling independent contractor claim for commission for services provided prepetition were not entitled to administrative priority even if the right to payment arose post-petition).

B. <u>COURT SHOULD CONTINUE DEBTOR'S MOTION TO ASSUME TO FUTURE DATE BECAUSE DEBTOR HAS NO IMMINENT DEADLINE TO ASSUME THE RRIA CONTRACTS UNDER SECTION 365(d)(2)</u>

Debtor Motion to Assume the RRIA Contracts is made pursuant to Section 365 and Rule 6006. As the United States Trustee noted in its initial Statement, there was no justification of "irreparable harm" for the Debtor to assume the RRIA contracts on the "first day". Upon information and belief, Debtor earns investment advisory commission fees from its many clients (the "gross commission fees") based on a percentage of assets under management. In turn, upon information and belief, Debtor splits the gross commission fees with the Representatives on terms set forth in the RRIA Contracts. Specifically, Debtor's RRIA Contracts cover the following Representatives (which are also identified in Debtor's Schedule G, Executory Contracts and Unexpired Leases):

1. <u>Jonathan C. Ulloa</u>:
 (a) Contract date: 11-16-2018:
 (b) Commission rate: 50%

2. <u>Quitin M. Guillermo</u>:
 (a) Contract Date: 11-16-2018

4

    (b)       Commission rate: 50%

3.      <u>Sandra McKeever</u>:
    (a)       Contract Date:  11-15-___  (*year unknown*); contract signed by Thad Jones, Vice President, for Asia Pacific
    (b)       Commission rate:  60%

4.      <u>Sophie Brindejonc</u>:
    (a)       Contract Date:  11-16-2018:
    (b)       Commission rate:  50%

5.      <u>Thad Jones</u>:
    (a)       Contract Date:  11-16-2018
    (b)       Commission rate:  60%

6.      <u>Jonathon Holm</u>:
    (a)       Contract date:  3-7-2022
    (b)       Commission rate:  "Flat Rate", with "flat rate method negotiated with team advisors"

At this early stage in the case, based on the information currently available, it is questionable whether the Debtor should be allowed to assume the RRIA contracts.

First, Debtor does not have any early case deadline that requires it to assume the RRIA contracts at this stage of the case.  Under the Code, Debtor has more time to determine whether to assume the RRIA contracts.  Because the RRIA contracts are not "unexpired leases of nonresidential real property", Section 365(d)(2) grants the Debtor discretion to decide when to assume or reject an executory contract "at any time before the confirmation of the plan".  *See In re EnCap Golf Holdings, LLC*, 2008 WL 5955350, at *3 (Bankr. D.N.J. 2008).  Because the Debtor has until significantly later in the case to make the decision whether to assume or reject the RRIA contracts, all parties in interest will be benefited by continuing the motion to allow ample time to carefully evaluate the possible benefits and burdens of the executory contracts.[4]

---

[4] During the pre-assumption period, although non-debtors are required to perform in accordance with a contract, the contract's terms are "temporarily unenforceable against the debtor."  A debtor-in-possession which "elects to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract" must, nevertheless, pay for the

Second, there is a lack of financial information on the consequences of assuming the RRIA contracts on the Debtor's future financial viability. Although Section 365 allows a debtor to assume[5] an executory contract or unexpired lease if the decision is supported by valid business justifications, to satisfy the business judgment test, the debtor must show that the proposed course of action will be advantageous to the estate and the decision is based on sound business judgment. *See In re TM Vill., Ltd.*, 598 B.R. 851, 859–60 (Bankr. N.D. Tex. 2019). The business judgment standard employed by courts in determining whether to permit a debtor to assume or reject a contract "presupposes that the estate will…reject contracts whose performance will benefit the counterparty at the expense of the estate". *See In re Old Carco LLC*, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009). "The primary question to guide the court in deciding whether a debtor has properly exercised its business judgment is 'whether rejection would benefit the general unsecured creditors.'" *In re Hertz*, 536 B.R. 434, 442 (Bankr. C.D. Cal. 2015). In this Subchapter V case, because the Debtor does not have any secured creditors, Debtor had no need to file a motion to use cash collateral, and Debtor did not file with the Court a cash collateral budget setting forth its 6-month projected profit and losses. As a result, the only profit & loss financial information in the Court's docket is from Debtor's filing of its financial statements for

---

reasonable value of those services. *See In re Travelot Co.*, 286 B.R. 462, 466 (Bankr. S.D. Ga. 2002), *as modified*, *order clarified on reconsideration*, 2002 WL 34705804 (Bankr. S.D. Ga. 2002) (internal citations omitted). The United States Trustee does not oppose Debtor paying the Representatives a reasonable interim compensation amount pending a final determination on Debtor's Motion to Assume.

[5] Assumption carries with it two substantial burdens to the estate. First, the estate takes on the debtor's obligations under the contract and these obligations become administrative expenses, which must be paid as a priority, before the debtor's prebankruptcy obligations. Second, pursuant to § 365(b), the trustee or debtor in possession may only assume the contract after demonstrating that the estate is able to meet the debtor's obligations—by promptly curing any existing defaults and giving adequate assurance of future performance. *In re Res. Tech. Corp.*, 254 B.R. 215, 221 (Bankr. N.D. Ill. 2000) (internal citations omitted).

year-end 2022, Dkt. #13-1.  Debtor's year-end 2022 statement of operations shows its single largest expense item was "Commissions", and that it had a *net loss*:

Operating expenses:
Commissions                                                     1,425,209

Debtor's year end 2022 financial performance showed a net loss:

Net Loss                                                        $  (149,208)

Give the lack of projected financial information in the record, combined with Debtor's *net loss* in 2022 (based on substantial levels of commissions), and the significant consequences of assuming the RRIA contracts, the Court does not have sufficient information to assess whether Debtor's proposed course of action in assuming the RRIA Contracts will be advantageous to the estate. Before the Court rules Debtor's Motion to Assume, the Debtor should be required to file with the Court its 6-month budgeted income and expenses.

Third, prematurely granting the Debtor's Motions to Assume could potentially prejudice parties-in-interest by "setting the table" for Debtor's Plan Confirmation proceedings.  There is a risk that granting Debtor's Motion to Assume the RRIA Agreements could prematurely determine issues that may be more properly decided in the context of plan confirmation.  Section 1191(b) allows Debtor to confirm a nonconsensual plan provided the Debtor commits its "projected disposable income" (as defined in Section 1191(d)) for the applicable commitment period.  Section 1191(d) defines "disposable income" as income received by the debtor that is not *reasonably necessary* to be expended for the payment of *expenditures necessary for the continuation, preservation, or operation of the business of the debtor*.  Granting assumption of the RRIA contracts could preclude any creditor from challenging the reasonableness of Debtor's

business expenditures, and its projected disposable income projections supporting a nonconsensual plan.[6]

Fourth, because several of the counterparties to the RRIA contracts, are "insiders" of the Debtor, the decision whether to assume these contracts should be subject to heightened scrutiny. *See In re Russell Cave Co., Inc.*, 253 B.R. 815, 821 (Bankr. E.D. Ky. 2000) (stating courts have flexibly defined the term "insider" as any entity or person with a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms-length with the debtor). In this case, Debtor's Statement of Financial Affairs ("SOFA"), Q.28 identifies Sandra McKeever, Melinda Sulit, and Jonathan Ulloa as Debtor's officers, directors, and shareholders:[7]

28. List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Sandra McKeever | 145 Aspinall Ave Hagatna, GU 96910 | CEO & Shareholder | 83.57 |

Official Form 207      Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy      page 10

Case 23-00005   Document 58   Filed 05/10/23   Page 33 of 35

---

[6] *See In re Network Access Sols., Corp.*, 330 B.R. 67, 79 (Bankr. D. Del. 2005) (dismissing Committee's avoidance actions, under doctrine of law of case and judicial estoppel, against counterparties to prepetition employment agreements which debtor had obtained court approval to assume).

[7] Although Thad Jones signed the RRIA contract, as Vice-President on behalf of Asia Pacific, for Sandra McKeever's commission agreement, he is not identified as an officer of Debtor in the Debtor's SOFA.

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Melinda Sulit | 145 Aspinall Ave Hagatna, GU 96910 | Executive Vice President | 10 |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Jonathan Ulloa | 145 Aspinall Ave Hagatna, GU 96910 | Shareholder | 6.25 |

Sandra McKeever and Jonathan Ulloa are also counterparties to the RRIA Agreements.[8]

Debtor's SOFA, Q.3 discloses that Sandra McKeever received $209,098.03 in the 90 days prior to the filing of the petition:

| 3.16 | Sandra McKeever 145 Aspinall Avenue Hagatna, GU 96910 | 2/17/23 3/20/23 4/20/23 | $209,098.03 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ■ Services ☐ Other___ |
|---|---|---|---|---|

Within 1 year prior to the filing of the petition, Sandra McKeever received $1,027,316.58:

| Insider's name and address Relationship to debtor | | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | Sandra McKeever 145 Aspinall Avenue Hagatna, GU 96910 Member | 4/19/22 5/20/22 6/20/22 7/20/22 8/18/22 9/21/22 10/20/22 11/21/22 12/21/22 12/22/22 1/25/23 2/17/23 3/20/23 4/20/23 | $1,027,316.58 | Services |

Jonathan Ulloa received $48,800.50 in the 90 days prior to the filing of the petition:

| 3.15 | Jonathan Ulloa 145 Aspinall Avenue Hagatna, GU 96910 | 2/17/23 3/20/23 4/20/23 2/17/23 3/20/23 4/20/23 | $48,800.50 | ■ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ■ Services ☐ Other___ |
|---|---|---|---|---|

---

[8]  It is not clear if Thad Jones had any discretion, on behalf of Asia Pacific, to decline signing the RRIA Agreement with counterparty Sandra McKeever, or whether Asia Pacific's decision to enter into this RRIA agreement was subject to an independent decision-making process.

Within 1 year prior to the filing of the petition, Jonathan Ulloa received $208,057.37:

| 4.2. | Jonathan Ulloa<br>145 Aspinall Avenue<br>Hagatna, GU 96910<br>Member | 4/19/22<br>5/20/22<br>6/20/22<br>7/20/22<br>8/18/22<br>9/21/22<br>10/20/22<br>11/21/22<br>12/21/22<br>12/22/22<br>1/25/23<br>2/17/23<br>3/20/23<br>4/20/23<br>2/17/23<br>3/20/23<br>4/20/23 | $208,057.37 | Services |
|---|---|---|---|---|

Because of the high level of compensation to Debtor's President (far in excess of other Representatives), Sandra McKeever, it may be premature for the Debtor to assume her RRIA contract. Normally, a debtor could exercise its discretion to take up to plan confirmation to decide whether to assume an executory contract, with the counterparty being permitted to seek an earlier date for assumption or rejection. *See In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003) (stating under 362(d)(2), debtor ordinarily has until plan confirmation to decide whether to assume or reject an executory contract, a counterparty to an executory contract may request an order compelling the debtor to assume or reject the contract by an earlier time). In this case, for some reason, Debtor filed the Motion to Assume on the "first day" (instead of maximizing the time to decide whether to assume or reject) and did not wait for the counterparties to act (which appears to be for the benefit the "insiders"). In any event, because Sandra McKeever owns 83.57% of the Debtor, it seems unlikely she would abandon her company if the Debtor's Motion to Assume were continued.[9]

---

[9] Although Debtor's Motion to Assume does not state in its relief a desire to make a "retention" payment to Debtor's "insiders" as an administrative expense under Section 503, because entry of a Court order assuming the RRIA Contracts would have the practical effect of transforming the Debtor's obligations under the RRIA Contracts into "administrative expenses", it is worthwhile

**II. DKT. #9: DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING EMPLOYMENT AND PAYMENT OF PROFESSIONALS UTILIZED IN THE ORDINARY COURSE OF BUSINESS AND (II) GRANTING RELATED RELIEF**

Debtor's Motion seeks authority to pay "ordinary course professionals" ("OCP") during the pendency of the case subject to a monthly fee cap, per professional, of "$25,000 per month on average over any rolling three-month period".  Although the Court entered an interim OCP order, the Court required Debtor to provide more information on the historical billings from the OCPs before the final hearing.  The Interim Order identified the OCP professionals as:

<u>SCHEDULE 1</u>

**(Ordinary Course Professionals)**

| Ordinary Course Professional | Mailing Address | Description of Services |
|---|---|---|
| Michael Best | 170 South Main Street Suite 1000 Salt Lake City, UT 84101 | Regulatory |
| Burger Comer Magliari CPA | 333 S. Marine Corps Drive #102 Tamuning, Guam, 96913 | Accounting |
| Saro Partners | 333 Tamiami Trail Suite 291 Venice, FL 34284 | Compliance |

---

to consider that Section 503(c)(1) sets forth extremely high hurdles making it difficult for a Debtor to make "retention" payments to insiders as an administrative expense.  Pursuant to Section 503(c)(1), Debtor is prohibited from making payment to an "insider" for the purpose of inducing such person to remain with the Debtor's business absent a finding from the Court that the payment is:  (1) essential to the retention of the person because that individual has a bona fide job offer from another business at the same or greater rate of compensation, (2) the services provided by the person are essential to the survival of the business, and (3) the payment is not greater than 10 times the amount of the mean retention payment to nonmanagement employees, or no such retention payments were made, the payment is not greater than 25% of a retention payment made to any insider in the year before.  Here, Debtor has not met the evidentiary requirements of Section 503(c)(1).

Since the entry of the Interim Order, Debtor has filed additional historical billing information regarding the OCPs, Dkt. #51: (1) Michael Best Law Firm: for regulatory services[10] requesting $7,000/mth for Monthly Fee Cap(2) Burger Comer Magliari CPA: $6,500 to $10,000 for an audit report, and up to $1,200 for tax return preparation, and requesting Annual Fee Cap of $15,000; (3) Saro Partners: monthly service fee of $2,000/mth, requesting Monthly Fee Cap of $2,000/mth. The United States Trustee respectfully requests any final form of the OCP order include the reduced fee caps disclosed above, subject to the procedures set forth in the interim OCP order.

**III. DKT. #11: DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE USING ITS CASH MANAGEMENT SYSTEM, AND (B) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS AND BOOKS AND RECORDS, AND (III) GRANTING RELATED RELIEF**

**A. DEBTOR SHOULD NOT BE EXCUSED FROM OPENING DEBTOR-IN-POSSESSION ACCOUNTS**

The United States Trustee understands the Debtor is in the process of requesting the Bank of Hawaii re-designate its pre-petition Bank of Hawaii Account ending in #1076 as its debtor-in-possession "operating" account. If the Bank of Hawaii agrees, and the account is properly designated as a debtor-in-possession "operating" account subject to all applicable safeguards (under the Uniform Depository Agreement between the Bank and the United States Trustee) for the estate's money (for the protection of creditors), then the United States Trustee does not object to a re-designation. If not, Debtor should immediately open a new debtor-in-possession

---

[10] The United States Trustee takes the position, and reserves all rights, that to the extent the Michael Best Law Firm provides any litigation services (non-regulatory), then such services will not fall under the scope of the OCP motion, and Debtor will need to file an application under Section 327 for employment and file fee applications under Section 330.

"operating" account.  Also, Debtor needs to open a new debtor-in-possession tax account and a new debtor-in-possession payroll account.

The United States Trustee has been agreeable to a short transition period, i.e., 2-3 weeks, to allow Debtor's staff to take action to ensure:  (1) authorized payments (i.e., court approved wages) may be completed (provided, however, Debtor takes adequate precautions to ensure that any pending prepetition payments are not honored), and (2) re-designate the old pre-petition account to a debtor-in-possession account, or open new debtor-in-possession accounts and ensure any post-petition deposits are re-routed from the old pre-petition bank account into the new debtor-in-possession account.   The Debtor should not be allowed an indefinite time to bring itself into compliance with the requirements to establish its debtor-in-possession accounts.

B.     <u>DEBTOR SHOULD BE REQUIRED TO TRANSFER "CASH" FUNDS FROM "RBC RESERVE ACCOUNT" TO DEBTOR-IN-POSSESSION ACCOUNT</u>

Debtor produced an April 2023 Account Statement from RBC Clearing & Custody Account, ending in x-9826 (the "RBC Reserve Brokerage Account").  As of April 30, 2023, Debtor has in the RBC Reserve Brokerage Account:  (1) $549.11 in cash, and (2) $353,515.23 in stocks and other assets (which appear to have been purchased prepetition).  Debtor's Motion requests, pursuant to Section 345(b)(2), a waiver of the requirements of Section 345(b) for the RBC Reserve Account.[11]  It does not appear, however, that RBC has any FDIC insurance for cash funds held in the account.  It is undisputed that RBC is not a depository approved to accept bankruptcy estate funds in Guam and the Commonwealth of the Northern Mariana Islands.  Accordingly, the United States Trustee opposes Debtor's request for a waiver of Section 345(b) and opposes Debtor's request to hold cash funds in the RBC Reserve Account.  There is no

---

[11]  Section 345(b) requires that money of the estate be deposited with an entity that has executed a bond in favor of the United States unless the Court otherwise orders.  Approved depositories ensure collateralization in excess of FDIC limits.

13

"cause" to excuse Debtor from the requirements of Section 345(b).  Debtor should immediately transfer the cash funds held in the RBC Reserve Account to a debtor-in-possession account held at an approved depository.  Further, upon any post-petition liquidation of any stocks or assets held in the RBC Reserve Account, Debtor should not invest any money/cash proceeds from any liquidation of any stocks or other assets, but should immediately transfer any and all cash proceeds to a debtor-in-possession account held at an approved depository.

Also, recently, Debtor's Schedules disclosed RBC Clearing Deposit Account ending in No. x-9800 ("RBC Deposit Account") holding $50,000:

| 7.1. | RBC Clearing Deposit; account No. 9800 | $50,000.00 |
| --- | --- | --- |

Although the United States Trustee has a pending request to the Debtor for further information about the RBC Deposit Account, unless Debtor provides more information to justify the Court waiving the requirements of Section 345(b) to the RBC Deposit Account, the Debtor should promptly transfer the cash funds held in the RBC Deposit Account to a debtor-in-possession account held at an approved depository.

## IV.   DKT. #12:  DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING PROCEDURES TO MAINTAIN CONFIDENTIALITY OF THE DEBTOR'S CLIENT LIST AND GRANTING RELATED RELIEF

The United States Trustee respectfully incorporates by reference her initial Statement filed April 27, 2023, Dkt. #21, at pp. 14-20.

The United States Trustee's position is that the *names* of parties to executory contracts are required to be disclosed in Schedule G.  The United States Trustee does not oppose redacting the home addresses of individual clients.  The disclosure of names only would not reveal "effectively, their wealth status."  Debtor's Supplemental Memorandum of Law, filed 5/8/23, p. 2.

In Guam, population of around 160,000, there is a very small community of parties who might need financial management services. This makes the *Asia Pacific* case very different from the Debtor's primary case citation, *In re Northstar Energy, Inc.*, 315 B.R. 425 (Bankr. E.D. Tex. 2004), in which the debtor's private list of potential investors in oil and gas acquisition and development was considered proprietary. On Guam, the few companies providing financial management services would likely know who the potential clients are, so disclosure of names should not be "devastating" to the Debtor's business. In this context, the names of customers do not appear to rise to the level of "commercial information." The Debtor's request comes down really to a desire for "*privacy*" which, while understandable, is not a basis to seal under Section 107.[12]

The Debtor justifies sealing because it would "reduce administrative cost and burden, by reducing unnecessary mail to thousands of individuals[.]" Debtor's Supplemental Memorandum of Law, Filed 5/8/23, p. 2. But the Debtor could easily obtain an order limiting notice. More importantly, saving money on mailing costs is not a consideration under Section 107(b).

Finally, the Debtor's claim that SEC regulations prohibit the disclosure is not true. The cited rule, Regulation S-P in 17 CFR Part 248, plainly has a general exception that allows disclosure of personal information "[t]o comply with federal … laws, rules and other applicable legal requirements." This exception, by its clear terms, allows the disclosure in Schedule G, a required federal form in all bankruptcy cases.

---

[12] The Debtor also claims that Section 105(a) authorizes the sealing of customer names. But Section 107(b) governs sealing requests. The Supreme Court has held that § 105(a) does not "allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421 (2021).

DATE: Honolulu, Hawaii, May 15, 2023.

Tiffany L. Carroll
Acting United States Trustee

By /s/ Neil Verbrugge
Trial Attorney